UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| ARLEN FOSTER and CINDY FOSTER<br><br>                    Plaintiffs,<br><br>       vs.<br><br>TOM VILSACK, Secretary, United States Department of Agriculture,<br><br>                    Defendant. | CIV. 13-4060-KES<br><br>MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |

Plaintiffs, Arlen and Cindy Foster, brought this suit under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-06, against defendant, Tom Vilsack, Secretary of Agriculture, United States Department of Agriculture (USDA). Plaintiffs ask this court to set aside the USDA National Appeals Division's (NAD) final order, which upheld the Natural Resources Conservation Service's (NRCS) determination that 0.8 acres of land of plaintiffs' property was a wetland. The parties have filed cross motions for summary judgment. For the following reasons, defendant's motion for summary judgment is granted, and plaintiffs' motion for summary judgment is denied.

**BACKGROUND**

The undisputed facts are:

Plaintiffs own and farm land within Miner County, South Dakota. Defendant, as Secretary of the USDA and acting through the NRCS, is given the authority by Congress to make and approve wetland determinations,

delineations, and certifications. The parties contest whether a 0.8 acre portion of plaintiffs' land, known as "Site 1," has properly been determined to be a wetland.

In November 2004, the NRCS made an initial determination that Site 1 (then referred to as "Site 18") was a wetland. In July 2008, plaintiffs filed a request for the agency to reconsider its determination. In 2009, the NRCS made a second determination that Site 1 was a wetland, but rescinded its determination on January 15, 2010.[1] On November 23, 2010, the NRCS returned to Site 1 in order to conduct field work. On June 23, 2011, the NRCS made its third determination that Site 1 was a wetland. A.R. 5-7.

Following the June 23, 2011, determination, plaintiffs appealed to the NAD, an independent agency within the USDA. Pursuant to USDA statutes and regulations, plaintiffs bore the burden of proving the NRCS's determination "was erroneous by a preponderance of the evidence" in order to be successful on appeal. *See* 7 U.S.C. § 6997(c)(4); 7 C.F.R. § 11.8(e). On October 18, 2011, a hearing was held in Mitchell, South Dakota, where the parties were allowed to present exhibits, elicit witness testimony, and conduct cross-examination. On January 10, 2012, the hearing officer issued his decision, in which he determined the NRCS followed proper wetland determination procedures, that Site 1 was a wetland, and that plaintiffs had not met their burden of proving the NRCS's determination was erroneous. *See* A.R. 225-238.

---

[1] The agency's reason for rescission of the 2009 determination related to date changes within procedural manuals used by the agency. A.R. 200.

On February 13, 2012, plaintiffs filed a request for the NAD director to review the hearing officer's decision. A.R. 244-252. On July 16, 2012, the deputy director issued his final review determination, upholding the hearing officer's decision. Finally, on May 31, 2013, plaintiffs filed this suit seeking relief from the deputy director's final determination. Docket 1. Pending before the court are motions for summary judgment from both parties regarding the NAD's final decision and order.

**LEGAL STANDARD**

Generally, a motion for summary judgment may be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Clark v. Kellogg Co.*, 205 F.3d 1079, 1082 (8th Cir. 2000). Although presented as motions for summary judgment, the parties are seeking this court's review of an agency's decision. Thus, the court must follow the standards set forth in the APA. *See Voyageurs Nat'l Park Ass'n v. Norton*, 381 F.3d 759, 763 (8th Cir. 2004); 5 U.S.C. § 706(2). Because agency decisions are reviewed, "the issue is not whether the material facts are disputed, but whether the agency properly dealt with the facts." *Lodge Tower Condo. Ass'n v. Lodge Properties, Inc.*, 880 F. Supp. 1370, 1374 (D. Colo. 1995). Therefore, the function of this court is to determine, as a matter of law, whether the agency's decision is supported by the administrative record and is consistent with the APA standards of review. *See, e.g., Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766,

769 (9th Cir. 1985); *Troy Corp. v. Browner*, 120 F.3d 277, 282 (D.C. Cir. 1997);

*Girling Heath Care, Inc. v. Shalala*, 85 F.3d 211, 214 (5th Cir. 1996).

Pursuant to the standards of review provided in the APA, this court will

set aside an agency's decision if it was "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." *Sierra Club v. E.P.A.*, 252

F.3d 943, 947 (8th Cir. 2001) (quoting 5 U.S.C. § 706(2)(A)). As the Supreme

Court has explained, agency action is "arbitrary or capricious" if

> [T]he agency has relied on factors which Congress has not
> intended it to consider, entirely failed to consider an important
> aspect of the problem, offered an explanation for its decision that
> runs counter to the evidence before the agency, or is so
> implausible that it could not be ascribed to a difference in view or
> the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.

29, 43 (1983). Additionally, this court "must also accept the agency's factual

findings if they are supported by substantial evidence." *Maverick Transp., LLC

v. United States Dep't of Labor, Admin. Review Bd.*, 739 F.3d 1149, 1153 (8th

Cir. 2014). " 'Substantial evidence is relevant evidence that a reasonable mind

would accept as adequate to support the [agency's] conclusion.' " *Id.* (quoting

*Steed v. Astrue*, 524 F.3d 872, 874 (8th Cir. 2008)) (alteration in original).

Although this court's review of the facts before the agency is "searching

and careful," the "standard of review is a narrow one. The court is not

empowered to substitute its judgment for that of the agency." *Citizens to

Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *overruled on

other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). If the agency's

decision "is supportable on any rational basis," it must be upheld. *Voyageurs*, 381 F.3d at 763 (citing *Friends of Richards-Gebaur Airport v. FAA*, 251 F.3d 1178, 1184 (8th Cir. 2001)). "This is especially true when an agency is acting within its own sphere of expertise." *Id.* Thus, "[w]hen the resolution of the dispute involves primarily issues of fact and analysis of the relevant information 'requires a high level of technical expertise, we must defer to the informed discretion of the responsible federal agencies.' " *Friends of Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1128 (8th Cir. 1999) (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 377 (1989)).

Nonetheless, "[t]he agency must articulate a 'rational connection between the facts found and the choice made.' " *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). While this court cannot "supply a reasoned basis for the agency's action that the agency itself has not given," it may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* at 285-86 (internal citations omitted). This court's review is limited to the administrative record as it existed before the agency, rather than encompassing new evidence presented here for the first time. *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

## DISCUSSION

### A.    Agency Action

This case is before the court pursuant to the APA. Because there appears to be disagreement on which agency action–that of the NRCS or that of the

NAD–is subject to review, clarification is warranted. *See, e.g.*, Docket 19 at 16 (arguing the NRCS's use of the Tetonka reference site was arbitrary and capricious); Docket 23 at 9 (describing this appeal as concerning the NAD deputy director's determination).

Following the NRCS's determination that Site 1 was a wetland, plaintiffs properly filed an appeal to the NAD. *See, e.g.*, 7 C.F.R §§ 12.6(c)(9); 614.1. Although the NAD and NRCS are both within the USDA, the NAD is an agency "independent from all other agencies and offices of the [USDA], including [USDA] officials at the state and local level." 7 C.F.R § 11.2(a). Initially, appeals before the NAD are assigned to a hearing officer who issues an appeal determination. *See* 7 U.S.C § 6997(d). Either party may then appeal to the NAD director for a review of the hearing officer's decision. 7 U.S.C. § 6998. Thus, "[t]he hearing officer's decision on the merits could then be appealed to the NAD Director, and the Director's decision on the merits then would become a final agency action subject to judicial review in accordance with the Administrative Procedure Act." *Bartlett v. United States Dep't of Agric.*, 716 F.3d 464, 474 (8th Cir. 2013);[2] *see also Lane v. United States Dep't of Agric.*, 120 F.3d 106, 109 (8th Cir. 1997) (detailing NAD hearing and appeal process).

Therefore, it is the "final determination of the [NAD]," rather than the determination of the NRCS, which "shall be reviewable . . . in accordance with" the APA. *See* 7 U.S.C. § 6999; *see also Bartlett*, 716 F.3d at 470. Because it is

_____

[2] Pursuant to USDA regulations, the director is permitted to delegate review authority to deputy or assistant directors within the USDA, whose final determination is considered to be that of the director's. 7 C.F.R. § 11.9(d)(3).

the NAD's final determination that is being reviewed, the question is not whether, for example, the NRCS itself acted arbitrarily or capriciously with respect to its wetland determination procedures. Rather, the inquiry is whether the NAD acted arbitrarily or capriciously by concluding that the NRCS followed proper wetland determination procedures when it found that Site 1 was a wetland and that plaintiffs had not met their burden of proving the NRCS's determination was erroneous. *See, e.g.*, *Dawson Farms v. Risk Mgmt. Agency*, 698 F.3d 1079, 1083 (8th Cir. 2012) (subjecting the NAD deputy director's decision to the arbitrary or capricious standard); *Clason v. Johanns*, 438 F.3d 868, 870-71 (8th Cir. 2006) (determining whether the NAD's conclusion was arbitrary or capricious); *Von Eye v. United States*, 92 F.3d 681, 685 (8th Cir. 1996) (explaining the court "must uphold the [NAD's] decision unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' ") (quoting 5 U.S.C. § 706(2)(A)).[3] Although only the NAD's final decision is being reviewed, the court will nonetheless construe the parties' arguments aimed at the NRCS's procedures as if they were directed toward the NAD's decision.

## B.    Wetland Determination

As part of the Food Security Act of 1985, Congress enacted what are commonly referred to as "Swampbuster" provisions "[i]n order to combat the disappearance of wetlands through their conversion into crop lands[.]" *Gunn v.*

---

[3] In the *Von Eye* decision, the Eighth Circuit denoted the National Appeals Division as the "NDS" rather than the NAD. *See Von Eye*, 92 F.3d at 682. The alteration here is for clarity.

*United States Dep't of Agric.*, 118 F.3d 1233, 1235 (8th Cir. 1997) (citing 16 U.S.C. §§ 3801, 3821-24); *see also Barthel v. United States Dep't of Agric.*, 181 F.3d 934, 935 (8th Cir. 1999). Originally, Swampbuster made anyone "produc[ing] an agricultural commodity on converted wetland" ineligible for certain USDA benefits. *See* 16 U.S.C. § 3821(a)-(b). Beginning in 1990, however, Congress expanded the reach of Swampbuster to affect individuals whose conversion of wetlands made "the production of an agricultural commodity possible[.]" § 3821(d). Although Swampbuster did not make the conversion of wetlands for agricultural purposes illegal, it "did provide that any agricultural production on a converted wetland would cause the farmer to forfeit his eligibility for a number of federal farm-assistance programs." *Gunn*, 118 F.3d at 1235.

Under Swampbuster, the USDA is directed to determine, delineate, and certify wetlands on farmland. 16 U.S.C. § 3822(a)(1). The NRCS, an agency within the USDA, is specifically charged with making the technical wetland determinations, delineations, and certifications. 16 U.S.C. § 3822(j); 7 C.F.R § 12.30(a)(3). In order for a parcel of land to be declared a wetland, three criteria must be present: (1) the land has a predominance of hydric soils; (2) the land has sufficient wetland "hydrology;"[4] and (3) under normal

---

[4] The phrase "hydrology" is used as a shorthand for the statute's second criteria that a wetland "is inundated or saturated by surface or groundwater at a frequency and duration sufficient to support a prevalence of hydrophytic vegetation typically adapted for life in saturated soil conditions." 16 U.S.C. § 3801(a)(27).

circumstances, the land supports a prevalence of hydrophytic vegetation. 16 U.S.C. § 3801(a)(27); 7 C.F.R. § 12.2(a).

To assist the NRCS in making wetland determinations, the agency was directed to "[d]evelop and utilize off-site and on-site wetland identification procedures[.]" 7 C.F.R. § 12.30(a)(4). To this end, the NRCS relies on several technical manuals and publications that describe the scientific procedures NRCS employees must follow when making a wetland determination. The manuals relevant to this discussion are:

1. National Food Security Act Manual (NFSAM); Part 527, Wetland Identification Procedures (Dec. 2010) (A.R. 452-473)
2. NFSAM; Part 514,Wetland Determination & Labels (2010) (A.R. 907 – 928)
3. 1987 U.S. Army Corps of Engineers Wetland Delineation Manual (COE Manual), Parts I & IV (A.R. 485-492; 520-571)
4. COE Manual Regional Supplement (CEO Regional Supplement): Great Plains Region Version 2.0 (March 2010)(A.R. 617-770)
5. NRCS South Dakota Mapping Conventions for Determining Potential Wetlands (A.R. 437-451)
6. Fish & Wildlife Service's National List of Plant Species that Occur in Wetlands: North Plains (May 1988)(A.R. 819-891)

Reference will be made to these manuals in conjunction with the procedures described below.

**i.    Hydric Soils**

To establish the first criterion for a wetland determination, the land must have "a predominance of hydric soils." 16 U.S.C. § 3801(27)(A); 7 C.F.R. § 12.2(a). The term "hydric soils" is further defined as "soil that, in its undrained condition, is saturated, flooded, or ponded long enough during a growing season to develop an anaerobic condition that supports the growth and regeneration of hydrophytic vegetation." 16 U.S.C. § 3801(12).

The deputy director agreed with the hearing official that Site 1 had a prevalence of hydric soils. A.R. 292. The deputy director also noted that plaintiffs did not challenge the NRCS's finding that Site 1 did, in fact, have a predominance of hydric soils. *Id.* Here, similarly, plaintiffs do not challenge this finding, instead focusing on the hydrology and hydrophytic vegetation criteria. *See* Docket 19 at 28-29 (". . . the only reliable, untainted finding made by the Agency, using lawful wetland procedures, was that the area contained hydric soil."). Although the predominance of hydric soils on Site 1 is not disputed, a brief description of the agency's procedure and findings will be useful during the subsequent discussion.

USDA regulations direct the NRCS to "identify hydric soils through the use of published soil maps which reflect soil surveys completed by NRCS or through the use of on-site reviews." 7 C.F.R. § 12.31(a)(1). Pursuant to procedures provided in the NRCS South Dakota Mapping Conventions, the agency initially reviewed a soil survey that revealed the presence of the "Clarno-Stickney-Tetonka" complex in the area of Site 1. A.R. at 65. This complex, referred to as "Tetonka," was listed on the county's hydric soils list. *Id.* The NRCS also reviewed its prior determinations regarding Site 1, investigated whether there had been any manipulations to the area prior to 1985, consulted national wetland inventory maps, and viewed other data within the agency's possession. *Id.* at 64-65. Based on these data, the NRCS determined Site 1 had wetland characteristics. *Id.* at 69.

Additionally, a soil scientist within the agency took ten soil samples. *Id.* at 115.[5] Of the eight soil samples taken from within Site 1, six were determined to be hydric. *Id.* at 124; *see also id.* at 355-364 (soil survey data sheets). Specifically, the six soil samples that were determined to be hydric were consistent with the Tetonka variety of hydric soils. *Id.* at 118. The other two samples taken from the surrounding area outside of Site 1 did not contain indicators of hydric soils. *Id.* at 129-130. Because six of the eight samples from within Site 1 were hydric, the agency determined Site 1 contained a predominance of hydric soils. *Id.* Thus, the first wetland criterion was established.

### ii.    Hydrology

The deputy director upheld the hearing officer's conclusion that Site 1 exhibited wetland hydrology. *Id.* at 295. The deputy director also explained that plaintiffs had not presented "any evidence or expert testimony to refute NRCS's conclusion[s]" or otherwise met their burden to show the NRCS's determination was wrong. *Id.* Here, as argued before the NAD, plaintiffs contend the NRCS improperly relied on so-called "color tone changes" observed from aerial photography to determine Site 1 had wetland hydrology. *See, e.g.*, Docket 19 at 22. Defendant responds that its use of aerial photography was permissible, and that plaintiffs misconstrue the agency's use of "color tone changes" in order to fill out data summary forms. *See, e.g.*, Docket 23 at 27-29.

---

[5] An aerial map depicting the location of the sample sites was included within the agency record. *See* A.R. 354.

In order to satisfy the second wetland criteria, the NRCS must determine if a parcel of land exhibits wetland hydrology. *See* 16 U.S.C. § 3801(a)(27)(B); 7 C.F.R. § 12.2(a). According to the COE Regional Supplement, South Dakota– and therefore Site 1–is located within the "Great Plains Region" of the United States. A.R. 631. Regarding hydrology in this region, the COE Regional Supplement explains:

> Wetlands are areas that are flooded or ponded, or have soils that are saturated with water, for long periods during the growing season in most years . . . However, some wetlands in the Great Plains do not become inundated or saturated in some years and, during drought cycles, may not inundate or saturate for several years in a row.

A.R. 745. Michelle Burke, an agricultural engineer with the NRCS noted that, at the time of the agency's November 2010 on-site visit, Site 1 was drier than it would be under normal environmental conditions during the spring growing season. *Id.* at 67. When seasonal or annual changes prevent normal environmental conditions from being present within areas less than 5 acres in size, like Site 1, the COE Manual directs the NRCS to follow the procedures in Part IV, Subsection G. *Id.* at 537-38.

Part IV, Subsection G, of the COE Manual is titled "Problem Areas." *Id.* at 569. It specifically identifies one type of problem area known as a "prairie pothole." *Id.* at 570.

> Prairie potholes normally occur as shallow depressions in glaciated portions of the north-central United States. . . . During dry years, potholes often become incorporated into farming plans, and are either planted to row crops (e.g., soybeans) or are mowed as part of a haying operation. When this occurs, wetland indicators of one or more parameters may be lacking. For example, tillage would

- 12 -

eliminate any onsite hydrologic indicator, and would make
detection of soil and vegetation indicators much more difficult.

*Id.* Burke explained that, at the time of the agency's visit, Site 1 was "located

on cropland with herbaceous vegetation removed generally by cropping and

tillage." *Id.* at 71. She also explained Site 1 existed in "a pothole region with

many small depressions in the area." *Id.* at 67. Subsequently, Site 1 was

determined to be a prairie pothole that may lack indicators of hydrology. *Id.* at

74; 78. On this point, the parties are not in dispute. *See* Docket 19 at 24 ("Site

1 is a prairie pothole, which is an area that periodically lacks indicators of

wetland hydrology."); *see also* Docket 23 at 26.

The COE Regional Supplement notes that "hydrology determinations are

based on indicators," and that some areas may lack indicators "particularly

during the dry season or in a dry year." A.R. at 745. During its on-site

inspection, the NRCS was unable to detect sufficient indicators of wetland

hydrology at Site 1. *Id.* at 91. If a potential wetland periodically lacks hydrology

indicators, the COE Regional Supplement identifies a three-step procedure to

follow. *Id.* at 746-751. The first step requires that "indicators of hydrophytic

vegetation and hydric soil are present or absent due to disturbance or other

problem situations." *Id.* at 746. The second step requires verification that "the

site is in a landscape position that is likely to collect or concentrate water." *Id.*

The third step directs the NRCS to employ one or more approaches to

determine if hydrology at the site is present. *Id.*

Regarding the first step, as previously discussed, the NRCS established the presence of hydric soil indicators in Site 1. Additionally, as discussed more fully below, the NRCS also determined indicators of hydrophytic vegetation had been removed or altered due to plaintiffs' farming operation. *Id.* 141. With respect to the second step, Burke explained Site 1 was "a concave area" that would "naturally pond water." *Id.* at 77. Regarding the third step, of the several approaches listed in the COE Regional Supplement, the NRCS chose to evaluate multiple years of aerial photography. *Id.* at 78. As explained in the COE Regional Supplement,

> The procedure uses five or more years of growing-season photography and evaluates each photo for wetness signatures that are listed in "wetland mapping conventions" developed by NRCS state offices. . . . Only photos taken in normal rainfall years, or an equal number of wetter-than-normal and drier-than-normal years, are used in the analysis. If wetness signatures are observed on photos in more than half of the years included in the analysis, then wetland hydrology is present.

*Id.* at 750.[6] The NRCS South Dakota Mapping Conventions identify ten wetland signatures the agency should look for: (1) hydrophytic vegetation; (2) surface water; (3) saturated conditions; (4) flooded or drowned-out crops; (5) stressed crops due to wetness; (6) differences in vegetation due to different planting dates; (7) inclusion of wet areas as set-aside or idled; (8) circular or irregular areas of unharvested crops within a harvested field; (9) isolated areas that are not farmed with the rest of the field; and (10) areas of greener vegetation (especially during dry years). *Id.* at 451. If any of the wetland signatures appear

_____

[6] These photos are taken by the Farm Service Agency (FSA) each year to monitor farmlands involved with USDA programs. A.R. at 749-50.

in greater than fifty percent of the "normal" rainfall year photos, the presence of wetland hydrology is established. *Id.*

Burke explained that the agency reviewed aerial photographs of Site 1 from the past twenty years. *Id.* at 91. Between 1991 and 2010, the agency determined that ten out of those twenty years received normal amounts of rainfall. A.R. 389-90.[7] After analyzing the aerial photos, Burke determined there were wetland signatures present at Site 1 in seven out of the ten normal rainfall years. *Id.* at 97. Because more than 50 percent of the normal rainfall years contained wetland signatures, the NRCS concluded Site 1 met the wetland hydrology criterion. *Id.* at 99.

 Here, plaintiffs raise two challenges regarding the aerial photograph procedure. First, plaintiffs briefly contest that because they filed an appeal with the NAD, the NRCS was precluded from using any off-site investigation methods such as aerial photography to determine if Site 1 was a wetland. Docket 23 at 28 (citing 7 C.F.R. § 12.30(c)(3)). On this point, defendant responds that plaintiffs have conflated two separate issues with respect to the need for an on-site determination. Docket 23 at 27.

Initially, the Eighth Circuit has, in general language, upheld the use of aerial photographs in order to establish wetland hydrology. *See Downer v. United States*, 97 F.3d 999, 1003 (8th Cir. 1996) (concluding "[a]gency regulations bear out the agency's contention" that the use of aerial

---

[7] The small "N" near the upper-left corner of the box containing the date indicates that year was a "normal" one for rainfall purposes. *See* A.R. 389-90.

photographs are "standard in its field of expertise and soil conservation.").

Nonetheless, the regulation cited by plaintiffs provides

> In the case of an appeal, NRCS will review and certify the accuracy of the determination of all lands subject to the appeal to ensure that the subject lands have been accurately delineated. Prior to a decision being rendered on the appeal, NRCS will conduct an on-site investigation of the subject land.

7 C.F.R. § 12.30(c)(3). The NRCS did, in fact, conduct an on-site investigation at Site 1 in November 2010. There is nothing in the language of the regulation that precludes the use of additional off-site tools as the procedural manuals instruct. Thus, plaintiffs have not shown that a wetland determination must be made solely by on-site methods.

Second, plaintiffs argue that it was improper for the agency to rely upon the so-called "color tone difference" wetland signature in order to determine Site 1 had wetland hydrology, because "color tone difference" is not one of the signatures provided for in the NRCS South Dakota Mapping Conventions. *See* Docket 19 at 25-26. Further, plaintiffs contend that the aerial photographs themselves demonstrate how unreliable differences in color tone can be, and that the NRCS offered no explanation for how the differences in the photos documented any wetland signatures. *Id.* at 26-27. The deputy director upheld the hearing officer's rejection of plaintiffs' "color tone differences" argument, noting that plaintiffs had not attempted to discredit Burke's testimony regarding the presence of wetland signatures nor had plaintiffs presented their own evidence sufficient to satisfy their burden of proof. A.R. 294-95. In its response, defendant argues it properly used the "color tone difference"

shorthand in order to fill out its data summary forms and, furthermore, that the agency never claimed "color tone difference" was an independent wetland signature. Docket 23 at 28-30.

The NRCS South Dakota Mapping Conventions specify ten wetland signatures that the agency should look for when using aerial photography to establish wetland hydrology. These wetland signatures are found on what is labeled "form SD-LTP-33" (form 33). *See* A.R. 451. Further instruction provides that "[t]he results of the [form 33] procedure must be documented correctly on form SD-LTP-28[.]" *Id.* at 450. This second form, SD-LTP-28 (form 28), is titled as a "data summary," which lists four abbreviations that can be used to document the presence of wetland signatures. *See id.* at 390. The four abbreviations are listed as "NC = No crop; INU = Inundation; CT = Color tone difference; PHM = Potential Hydrological Manipulation[.]" *Id.* Burke used the "CT" abbreviation when she filled out form 28. *See id.* at 390-91.

While plaintiffs are correct that "CT" or "color tone difference" is not one of the ten wetland signatures provided in the NRCS South Dakota Mapping Conventions, defendant is correct that "CT" is one of only four options available to fill out form 28. Because form 33 directs the NRCS to document their findings on form 28, and because form 28 specifically provides only four abbreviations that can be used, one of which is "CT," the court finds that defendant is correct that Burke completed form 28 as it was intended to be used. *See* Docket 23 at 30.

Additionally, Burke testified that her analysis of the aerial photographs revealed the presence of wetland signatures in seven of ten normal rainfall years. A.R. at 97. Her testimony also provided some details of how portions of form 28 were filled out before arriving at her conclusion. *See id.* at 94. Plaintiffs chose not to cross-examine Burke regarding the contents of form 28, however, and they did not ask her to clarify which signatures were observed. Plaintiffs bore the burden of proving the NRCS's determination was erroneous by a preponderance of the evidence. While not specifying which signatures she found, Burke's testimony indicated that wetland signatures were observed during a sufficient number of normal rainfall years in order to establish the hydrology criterion. As the deputy director explained, although parts of Burke's testimony were "abbreviated and conclusory," plaintiffs failed to meet their burden because they did not challenge her testimony regarding the presence of wetland signatures. *See id.* at 295. Plaintiffs' concern that "[w]hat the color changes identify specifically is completely unknown beyond the particular Agency reviewer," Docket 19 at 27, could have been addressed during cross-examination of Burke or by presenting their own expert witness to analyze the photographs. But plaintiffs did neither.

Moreover, plaintiffs' opinion regarding the reliability of using observable color tone differences from the aerial photographs is problematic for several reasons. First, as discussed, the record shows that Burke filled out form 28 in accordance with NRCS procedures. Second, Burke testified she is a licensed professional engineer with 21 years of experience working with the NRCS. A.R.

at 61. Her position involves engineering and wetland hydrology determination responsibilities. *Id.* By contrast, plaintiffs have no comparable scientific expertise that would be relevant to interpreting the aerial photographs for wetland hydrology signatures. Third, Burke testified that she observed wetland signatures in seven of the ten normal rainfall years. Plaintiffs' rhetorical question, "[w]hat does the green dot [in one photo] show that is not present in the other green areas," Docket 19 at 27, would have been more appropriately asked during Burke's cross-examination than in their brief.[8] Consequently, plaintiffs' hindsight effort to undermine the credibility of the agency's witness and the aerial photography is unpersuasive.

Finally, the bedrock of plaintiffs' argument is that the agency should have provided a better explanation with respect to which signatures the "color tone differences" shorthand corresponds. Plaintiffs fault the NAD's final decision because "[n]o evidence from the Agency has been presented that indicates the color changes identify wetland signatures." Docket 19 at 27. As the deputy director observed, however, the NRCS offered testimony that a sufficient number of wetland signatures were present to establish the hydrology requirement. A.R. 295. Additionally, as the deputy director concluded, because plaintiffs did not challenge this testimony or offer any expert testimony to the contrary, plaintiffs did not meet their burden of proving

---

[8] Defendant offered an answer to plaintiffs' question of what specific signatures may have been observed. *See* Docket 23 at 31. The scope of this court's review, however, is limited to what appeared in the record before the agency, and does not extend to new evidence offered for the first time on appeal. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973).

the NRCS's determination was erroneous. *Id.* Ultimately, the deputy director agreed with the hearing officer's determination that Site 1 met the hydrology criterion. That the NAD ultimately found the unchallenged expert testimony of the NRCS persuasive cannot be said to be an "explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Because of the evidence before it and the allocation of the burden of proof between the parties, the court concludes the NAD articulated "a 'rational connection between the facts found and the choice made.' " *Bowman Transp.*, 419 U.S. at 285 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). Therefore, the court finds the deputy director did not act arbitrarily or capriciously by upholding the hearing officer's conclusion that Site 1 exhibited wetland hydrology.

### iii.    Hydrophytic Vegetation

The deputy director agreed with the hearing officer that Site 1, after following the NRCS's reference site procedure, met the hydrophytic vegetation criterion. A.R. 297. Plaintiffs assert the NRCS's use of the Tetonka reference (or "comparison") site was improper because it allowed the agency to circumvent the need for establishing all three wetland criteria and is otherwise inconsistent with USDA regulations. *See, e.g.*, Docket 19 at 16-17. Defendant argues use of the reference site under the circumstances was proper. *See, e.g.*, Docket 23 at 17-18.

The term "hydrophytic vegetation" is defined as "plants growing in water or in a substrate that is at least periodically deficient in oxygen during a growing season as a result of excessive water content." 7 C.F.R § 12.31(b). In order to establish this third wetland criterion, the NRCS must determine whether, "under normal circumstances," the land supports a prevalence of hydrophytic vegetation. 16 U.S.C. § 3801(27)(C); 7 C.F.R § 12.2(a). If the land's vegetation has been altered or removed, however, the NRCS must "determine if a prevalence of hydrophytic vegetation typically exists in the local area on the same hydric soil map unit under non-altered hydrologic conditions." 7 C.F.R. § 12.31(b)(2)(ii). The COE Regional Supplement further explains that the NRCS should "[e]xamine the vegetation on a nearby, unmanaged reference site having similar soils and hydrologic conditions." A.R. 735. Following this procedure, the agency may then "[a]ssume that the same plant community would exist on the [altered] site in the absence of human alteration." *Id.* Additionally, "[r]eference sites should be minimally disturbed and provide long-term access." *Id.* at 738.

Kevin Luebke, a biologist with the agency, testified that Site 1's vegetation had been altered or removed by plaintiffs' farming operation, which made an on-site determination of the prevalence of hydrophytic vegetation unreliable. *Id.* at 141.[9] Because the hydrophytic vegetation determination could

---

[9] Plaintiffs cite *S.E.C. v. Chenery Corp.*, 332 U.S. 194 (1947) for the proposition that the NAD's decision cannot be sustained because the NRCS failed to adequately present evidence that shows how the Tetonka reference site met the USDA regulation's requirements in order to show Site 1 had a prevalence of hydrophytic vegetation. *See* Docket 25 at 7. Plaintiffs bore the burden of proving the NRCS's determination was erroneous. For that reason, and for the reasons

not be made on Site 1, the agency used a reference site for comparative purposes. *Id.* at 144. The site chosen was referred to as the "Tetonka reference site," and is located in Kingsbury County, South Dakota. *Id.* at 146; *see also id.* at 960. The Tetonka site was "from an approved list of sites previously established." *Id.* at 146. According to Luebke, these reference sites were established to insure that suitable reference sites would be available for future use. *Id.* Additionally, a map attached to the administrative record shows the Tetonka site is located approximately 33 miles from Site 1. *Id.* at 1117. Luebke described the Tetonka site as a pothole, similar to Site 1.  *Id.* at 151. Further, according to his testimony, both the Tetonka site and Site 1 received between 18 and 25 inches of rain per year. *Id.* at 152.

Luebke also testified that the agency had acquired the Tetonka site's hydrophytic vegetation data from around the July 2000 growing season. *Id.* at 147. Because the site has been preserved as a reference site, it would still retain those same vegetative characteristics. *Id.* at 147-49. According to Luebke, the reference site bore the same Tetonka hydric soils as Site 1 and contained similar wetland hydrology as Site 1. *Id.* at 150-51. Luebke also explained that the Tetonka reference site was on the same "major land resource area" (MLRA) as Site 1, which, according to his testimony, was the agency's interpretation of the regulation's "local area" language. Thus, according to Luebke, the Tetonka site met each of the USDA regulation's requirements and could be used as a reference site to determine Site 1's hydrophytic vegetation.

that follow, the court disagrees with plaintiffs' contention.

*Id.* Following a comparison to the reference site, the agency concluded Site 1 would have supported a prevalence of hydrophytic vegetation in the absence of human alteration. *Id.* at 153. Notably, plaintiffs chose not to cross-examine Luebke. *Id.*

The parties do not dispute that the vegetation on Site 1 has been altered or removed. *See* Docket 19 at 17; Docket 23 at 17. Additionally, the parties do not dispute that the NRCS may use reference sites to make the hydrophytic vegetation inquiry under such circumstances. Rather, the parties dispute whether use of the reference site in this instance allowed the NRCS to bypass determining the other wetland criteria, as well as the precise meaning of the USDA regulation's "local area" language.

### a.  Conflation of Wetland Criteria

First, plaintiffs contend that the use of a pre-determined wetland as a reference site will always result in the conclusion that areas compared to it will be found to have hydrophytic vegetation. Docket 19 at 17. According to plaintiffs, this allows the agency to conflate the separate requirements that the land have a prevalence of hydric soil with the requirement that the land support a prevalence of hydrophytic vegetation. *Id.* at 19 (citing *B&D Land & Livestock Co. v. Schafer*, 584 F. Supp. 2d 1182, 1194-95 (N.D. Iowa 2008)). Defendant responds that the agency gave consideration to each wetland determination criteria, and, citing *Downer*, notes that the Eighth Circuit has upheld the use of reference sites. Docket 23 at 25. While plaintiffs' conflation argument was not specifically raised before the NAD, the deputy director

- 23 -

ultimately concluded that the NRCS's use of a reference site was permissible. A.R. at 297.

Although first discussed in conjunction with the NRCS's use of aerial photographs, the Eighth Circuit has also, in general terms, upheld the agency's use of comparison sites. *See Downer*, 97 F.3d at 1003-04. Plaintiffs contend, however, that the Eighth Circuit has not considered specific challenges to the use of comparison sites because the only issue raised by the plaintiff in *Downer* was whether the use of off-site tools was acceptable. Docket 25 at 11 (citing *Downer*, 97 F.3d at 1003)). Regardless, plaintiffs' characterization of the reference site procedure is flawed for several reasons.

The USDA regulation contemplates use of a reference site to establish the hydrophytic vegetation criterion if the vegetation on a potential wetland has been altered or removed. Further, if the regulatory requirements for using a reference site are met, then the agency may assume the same plant community that exists on the reference site would also exist on the altered site had its vegetation not been altered or removed. *See* A.R. 735. Pursuant to the USDA regulation, the reference site must be in the "local area," as well as on the "same hydric soil map unit" which is "under non-altered hydrologic conditions." *See* 7 C.F.R. § 12.31(b)(2)(ii). Thus, the regulation required the NRCS to establish an equivalence between the hydric soils found on Site 1 and the reference site, as well as a connection between the hydrologic conditions on Site 1 and the reference site. Additionally, the agency needed to select a reference site located within the "local area." Luebke's testimony that the

agency made each of these findings went unchallenged, and the deputy director concluded the reference site met all of the regulatory requirements. *See* A.R. 296-97.

The present situation is therefore different from that described in the *B&D Land & Livestock* decision where the agency simply treated the prevalence of hydrophytic vegetation as sufficient to establish the wetland hydrology criterion. *See B&D Land & Livestock*, 584 F. Supp. 2d at 1199. Here, because the natural conditions of Site 1 had been altered or were temporarily lacking, the USDA regulations required the "local area" and "non-altered hydrologic conditions" to be met. *See* 7 C.F.R § 12.31(b)(2)(ii). Rather than conflating the wetland criteria, the agency followed the proper regulatory procedure that applied to the circumstances present on Site 1.

Further, plaintiffs' objection that the reference site had previously been determined to be a wetland is answered by the COE Regional Supplement's policy, which directs reference sites to be "minimally disturbed and provide long-term access" for comparative purposes. A.R. 738. Thus, using an established and maintained wetland as a reference site allows the agency to compare potential sites to it for a longer period of time, as well as ensuring the "non-altered hydrologic conditions" requirement can be analyzed. Moreover, it would make little sense for the agency to attempt to compare a potential wetland to a parcel of land whose properties were unknown. Finally, even without regard to the COE Regional Supplement's policy, as the hearing officer explained, plaintiffs "cite[d] no policy or provision that prohibits this practice. It

seems a reasonable and cost effective way of making determinations when the comparison site meets the [regulatory] requirements[.]" A.R. 236. Thus, although not specifically argued before the NAD, the record shows that the NRCS did not conflate the separate wetland criteria by using a reference site.

### b.    The "Local Area" Requirement

Second, regarding use of the specific Tetonka site itself, plaintiffs raise a series of arguments with respect to the "local area" requirement of the USDA regulation. One of the regulatory elements for using a reference site is that the site be "in the local area." *See* 7 C.F.R. § 12.31(b)(2)(ii). The parties have provided no prior legal authority interpreting the "local area" language, and instead, offer competing definitions and examples.

Kevin Luebke testified that the NRCS interprets the "local area" requirement as encompassing the land within an MLRA. A.R. 151-52.[10] According to Luebke, because Site 1 and the Tetonka reference site were both within the MLRA designated as "55C," use of the Tetonka reference site satisfied the regulation's "local area" element. *Id* at 151-52. Luebke concluded that because each of the regulation's other requirements were satisfied as well, the Tetonka site could be used as a reference site. *Id.*

Regarding the meaning of the "local area" language, the deputy director ultimately found that the "NRCS's interpretation of its own regulation is reasonable" and therefore, entitled to deference. A.R. 297 (citing *Auer v.*

_____

[10] MLRAs are described as "geographically associated land resource units" which are demarcated after a consideration of characteristics such as their "physiography, geology, climate, water, soils, and land use." A.R. 403.

*Robbins*, 519 U.S. 452, 461 (1997)). The deputy director considered but rejected plaintiffs' argument that the Tetonka site was not within the "local area" as contemplated by the regulation. *Id.* Thus, the deputy director concluded that, because Site 1 and the Tetonka site were within the same MLRA, the Tetonka site was in the "local area." *Id.*

Here, plaintiffs argue that deference is owed instead to the authors of the NFSAM. Docket 19 at 21. Plaintiffs do not specify an alternative definition for the "local area" language, but they assert that the NRCS should have limited its investigation to land adjacent or in close proximity to Site 1. *Id.* at 21-22. Ultimately, plaintiffs argue that no deference is due to the explanation offered by Luebke. *Id.* at 20-21. Defendant argues the definition supplied in Luebke's testimony is consistent with the statute. Docket 23 at 20. Additionally, defendant asserts that plaintiffs' construction of the "local area" requirement would not meet the regulation's additional constraints. *Id.* at 23.

There are several problems with plaintiffs' arguments. First, while plaintiffs contend that the authors of the NFSAM are entitled to a measure of deference, the portion of the NFSAM cited by plaintiffs merely restates the same regulatory language found in 7 C.F.R. § 12.31(b)(2)(ii). *See* Docket 19 at 21 (citing A.R. 909). Plaintiffs do not explain how the NFSAM's circular reference to the regulation shines any new light on the "local area" requirement. Consequently, even if some level of deference were owed to the authors of the NFSAM, there is nothing for the court to defer to here. Rather, it appears that

the NFSAM simply directs the NRCS to follow the USDA regulation–the very contention the NRCS argues it has done.

Second, in support of what appears to be their own definition, plaintiffs point to two sites on their land that were offered to the agency in 2009 for comparison purposes.[11] Docket 19 at 18. These sites were located within one mile from Site 1 and, according to plaintiffs, would satisfy the "local area" requirement. *Id.* As defendant argues, however, although plaintiffs' comparison sites may literally be more local than the Tetonka site, the USDA regulation also requires the comparison site to be "on the same hydric soil map unit" and "under non-altered hydrologic conditions." Docket 23 at 23 (citing 7 C.F.R § 12.31(b)(2)(ii)). As the hearing officer observed, plaintiffs offered no evidence that these additional requirements were met by their comparison sites. A.R. 236. Further, the agency's soil samples revealed differences in the hydric soil content within a short distance from Site 1, which undermines plaintiffs' argument that proximity alone is sufficient to satisfy the regulation. Moreover, the NRCS explained that

> [A]t the [plaintiffs'] request we conducted a visual assessment of two grassed pasture/hayland fields for potential vegetative reference sites. These fields were cropped, hayed, grazed, and/or sprayed in their recent history. Most of the onsite vegetation was unidentifiable due to disturbance. . . . The Tetonka reference site in Kingsbury County (NW 1/4 S27, T110 R56) was used.

---

[11] When asked if plaintiffs had offered the NRCS comparison sites, Mrs. Foster replied, "Yes, I did. That was not in this November of 2010 visit. It was in the previous one in 2009." A.R. 186.

A.R. 1021. Thus, the agency determined plaintiffs' reference sites did not meet the regulation's requirements and, as the hearing officer pointed out, plaintiffs have presented no evidence which suggests that determination was wrong. *See id.* at 236. Consequently, plaintiffs' own construction of the "local area" requirement cannot satisfy the regulation's other requirements.[12]

Therefore, the remaining issue is whether deference is owed to the "local area" interpretation offered in Luebke's testimony. The specific regulation at issue provides that the "*NRCS will determine if* a prevalence of hydrophytic vegetation typically exists in the local area . . . ." 7 C.F.R § 12.31(b)(2)(ii) (emphasis added). Thus, the regulation explicitly charges the NRCS with making the "local area" determination as part of its investigation.  To this end, Luebke's testimony purports that "the agency is defining" and "the agency is saying" it interprets the "local area" requirement as encompassing land within an MLRA. *Id.* 151. Typically, as the deputy director observed, an agency's interpretation of its own regulation is entitled to deference. *See* A.R. 297; *Auer,* 519 U.S. at 461. Whether the definition offered by Luebke in fact represents the agency's interpretation, however, is unclear.

---

[12] In addition to the proximity argument, plaintiffs also argue the Tetonka site received "dissimilar precipitation levels" and had a "much deeper depression" than Site 1.  Docket 19 at 18. According to Luebke's unchallenged testimony, however, both sites received an average of 18-25 inches of rain per year and both sites were determined to be similar potholes. A.R. 151-52. Luebke's testimony indicates the agency took this information into account when selecting a reference site. Plaintiffs have not shown, beyond a bare assertion, that the range of rainfall shared by both locations or the differences in the depth of the potholes renders the Tetonka site insufficiently "local."

Nonetheless, plaintiffs had the opportunity to cross-examine Luebke's testimony about the agency's interpretation, but chose not to. Moreover, while Luebke's statement arose during testimony before the hearing officer on October 18, 2011, the NRCS's earlier summary report dated June 15, 2011, also uses the same equivalence between the "local area" and an MLRA. *See* A.R. 346 (explaining the Tetonka site "is located within the same Major Land Resource Area 55C (local area)"). Thus, the definition supplied before the hearing officer was not solely offered as a " 'post hoc rationalization[]' for agency action, advanced for the first time" as a litigation position. *See Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 156 (1991). Additionally, making the "local area" determination–as well as the wetland determination itself–implicates "complex matters within the [agency's] area of expertise[.]" *See Clason*, 438 F.3d at 871. While not controlling, the court concludes that, based on these factors, the interpretation offered by Luebke and accepted by the NAD "give[s] it power to persuade." *See Godinez-Arroyo v. Mukasey*, 540 F.3d 848, 851 (8th Cir. 2008) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). Therefore, the court finds the NAD did not act arbitrarily or capriciously by choosing to defer to the interpretation offered by the NRCS. Thus, the court finds the NAD did not act arbitrarily or capriciously by concluding that, because Site 1 was located within the same MLRA as the Tetonka site, the "local area" requirement was satisfied.

In summary, the Tetonka site met each of the USDA regulation's requirements for use as a reference site, and the NRCS could consider the

vegetation on the Tetonka site in order to determine if Site 1 would support a prevalence of hydrophytic vegetation in the absence of human alteration. The deputy director did not act arbitrarily or capriciously by concluding Site 1 met the hydrophytic vegetation criterion following the NRCS's comparison. Additionally, the NRCS did not conflate any of the three wetland criteria by comparing Site 1 to an otherwise proper reference site in order to establish Site 1's hydrophytic vegetation. Thus, the court concludes the NAD has articulated "a 'rational connection between the facts found and the choice made.' " *Bowman*, 419 U.S. at 285 (citation omitted). Therefore, the court finds the deputy director did not act arbitrarily or capriciously by upholding the hearing officer's conclusion that Site 1 met the hydrophytic vegetation criterion.

**C.      Plaintiffs' Evidence**

Finally, plaintiffs contend the NRCS ignored evidence that would have demonstrated Site 1 was not a wetland. According to plaintiffs, this evidence undermines the findings of the NRCS with respect to the hydrology and hydrophytic vegetation criteria. For example, plaintiffs argue the NRCS refused to consider the effects from snowmelt of a nearby shelterbelt that causes water to drain onto Site 1. Docket 19 at 31. Additionally, plaintiffs contend that the NRCS refused to consider two holes plaintiffs dug which, according to their own observations, revealed an absence of long-term water ponding. *Id.*[13]

---

[13] Plaintiffs also contend that the NRCS refused to consider the two locations on plaintiffs property offered as reference sites. Docket 19 at 31. The NRCS did consider the sites offered by plaintiffs, however, and rejected them because those sites did not meet the USDA regulation's requirements.

First, plaintiffs cite the *B&D Land* decision, noting that the court faulted

the NAD for ignoring the credibility of the plaintiff's expert evidence. Docket 19

at 30 (citing *B&D Land*, 584 F. Supp. 2d at 1199.). Plaintiffs, however, have

presented no expert testimony or evidence with respect to the agency's wetland

determination procedures. Additionally, as the hearing officer explained,

plaintiffs themselves possess no expertise in making wetland determinations.

A.R. 234. Thus, comparison to the *B&D Land* decision on this point is

inapposite.

Second, the administrative record shows that the NRCS did not ignore

plaintiffs' findings, but rejected them based on other considerations. With

respect to melting snow from the shelterbelt running off into Site 1, Michelle

Burke testified that the possibility Site 1 could be an artificial wetland was

investigated and dismissed. A.R. 155. According to her testimony, in order for

an area to be an artificial wetland, it would first have to be a non-wetland that

was transformed over time. *Id.* Regarding the soil samples taken from Site 1

and its surrounding area, the sample taken nearest to the shelterbelt was not

hydric, nor was the snow that would collect and melt into water sufficient to

create hydric soils. *Id.* at 156. As the hearing officer explained, "[i]f the draining

snowmelt was the cause of the hydric soils at Site 1, then the soil between the

shelterbelt and Site 1 should also be hydric. However, even the soil next to the

shelterbelt is an upland soil and not hydric." *Id.* at 237. Additionally, plaintiffs

estimated that the shelterbelt was planted in 1936, Docket 19 at 12, but the

NRCS determined the soil profile in Site 1 dated back to glaciation. A.R. 156-

57. Here, too, the hearing officer noted that this "indicates the necessary hydrologic conditions were present long before the shelterbelt existed." *Id.* at 237. Thus, the hearing officer agreed with the NRCS that the shelterbelt was not the only source of water draining into Site 1, that the hydric soils were only found within Site 1, and that the soil profile within Site 1 predated the shelterbelt's existence. *Id.* at 237-38.

With respect to the two holes plaintiffs dug in order to observe water levels, Burke testified that this information was also considered by the NRCS. *Id.* at 157-58. According to her testimony, the test holes near the trees and in the wetlands responded similarly to rainfall. *Id.* at 158. The agency's observations were also noted in the June 15, 2011, summary report. *Id.* at 346 (concluding the data provided by plaintiffs was "Consistent with NRCS findings."). Moreover, as the hearing officer explained,

> [Plaintiffs] [c]ited no regulation or authority for this procedure. [Plaintiffs] stated there were no measuring devices, like a piezometer, used to measure the water entering or leaving the holes. [Plaintiffs] stated that there was no tubing or structure of any kind inside the holes and that it was "just dirt." . . . Therefore, this data is unreliable and not suitable for drawing conclusions about whether Site 1 is a wetland or not.

*Id.* at 234-35. Thus, the hearing officer concluded the NRCS's conclusions were not only supported by expert testimony but also by the proper procedures for making wetland determinations. *Id.*

This court must "accept the agency's factual findings if they are supported by substantial evidence," and " '[s]ubstantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the

[agency's] conclusion.' " *Maverick Transp.*, 739 F.3d at 1153 (citations omitted). The foregoing discussion shows that neither the NRCS nor the NAD ignored plaintiffs' findings. Instead, plaintiffs' findings were considered and, as detailed by the hearing officer, rejected as being inconsistent with wetland determination procedures or otherwise scientifically unreliable. Plaintiffs bore the burden of proving the NRCS's determination was erroneous by a preponderance of the evidence. Throughout the NAD appeal procedure, however, plaintiffs chose to either not challenge NRCS experts regarding their findings and conclusions, and to present only lay evidence that both the NRCS and NAD addressed and rejected. After reviewing the agency record, the court concludes the NAD's factual findings are supported by substantial–and, at times uncontroverted–evidence.

In sum, the NAD considered each of the three wetland criteria, as well as the NRCS procedures required to establish those criteria. Ultimately, the NAD concluded that each of the three criteria had been established, and that plaintiffs had not met their burden of proving the NRCS's determination was erroneous. A.R. 297. The court finds the administrative record supports the NAD's conclusions, and that plaintiffs have not shown the NAD "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Moreover, the court concludes the agency has made a rational connection between the facts

- 34 -

found and the choice made. *Bowman*, 419 U.S. at 285 (citation omitted). Thus, the court finds that plaintiffs have not shown the NAD acted arbitrarily or capriciously. Summary judgment in favor of the defendant is granted.

## CONCLUSION

Plaintiffs have failed to show that the NAD acted arbitrarily or capriciously with respect to its conclusions that the NRCS properly followed its wetland determination procedures, that Site 1 was a wetland, and that plaintiffs failed to meet their burden of proving the NRCS's determination was erroneous. Accordingly, it is

ORDERED that the motion for summary judgment by defendant (Docket 22) is granted.

IT IS FURTHER ORDERED that the motion for summary judgment by plaintiffs (Docket 26) is denied.

Dated October 31, 2014.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE